STATE of Utah, Plaintiff and
Respondent,

v.

Sigifredo Eduardo SIERRA,
Defendant and Appellant.

No. 870350–CA.

Court of Appeals of Utah.

May 18, 1988.

James L. Shumate (argued), Cedar City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Sandra L. Sjogren (argued), Asst. Atty. Gen., for plaintiff and respondent.

Before BILLINGS, BENCH and JACKSON, JJ.

## OPINION

BILLINGS, Judge:

Sigifredo Eduardo Sierra ("Sierra") appeals from his conviction for possession of a controlled substance with intent to distribute for value, in violation of Utah Code Ann. § 58–37–8 (1986). Sierra contends the police officer's stop of his car was a pretext, in violation of his fourth amendment rights against unreasonable searches and seizures.[1]

Because a determination of the constitutionality of a police officer's stop of a person under the fourth amendment turns upon the facts of each case, we review the facts in detail. State v. Trujillo, 739 P.2d 85, 86 (Utah Ct.App.1987). During the afternoon of March 6, 1987, Officer Smith, while traveling north on Interstate 15 near Leeds, Utah, noticed the car in front of him had New York license plates. As Officer Smith passed the car, he noticed Sierra, the driver, glance at him and then look quickly away and "kinda bow his head." Officer Smith radioed the car's license plate number to the dispatcher in Cedar City, requesting a computer check on the car. The check revealed the car had not been stolen. Nonetheless, based upon Sierra's purported "suspicious nature and the way [Sierra] reacted when he [saw] me," Officer Smith informed the dispatcher that he was "going to go after the vehicle and check [it] more closely" and requested back-up assistance. Consequently, Officer Smith accelerated, exceeding the posted maximum speed limit, to catch the car.

Officer Smith discovered the car traveling in the left lane of the highway which was designed for two lanes proceeding in the same direction. Officer Smith followed the car as it traveled 56 miles per hour and passed two other cars which were in the right lane. The car remained in the left lane for "40 to 50 seconds" according to Officer Smith. Officer Smith surmised that Sierra could have returned to the right lane on "a couple" of occasions, but did not. Officer Smith "decided [he'd] stop this vehicle and explain to [Sierra] [Utah's] left-lane law, giving him a warning for traveling in the left lane and not yielding immediately." Officer Smith, while still in the left lane, turned on the patrol car's red light and signaled the car to pull over.

Officer Smith approached the car and asked Sierra for a driver's license and the car's registration. Sierra produced a valid registration and stated that his name was Sigfredo Eduardo Sherra, that his birthdate was April 4, 1961, and that he had lost his wallet and therefore could not furnish his New York driver's license. Officer Smith issued Sierra a traffic citation for driving without a license and a warning for driving in the left lane in violation of Utah Code Ann. § 41–6–55 (1987).

A conversation between Officer Smith and Sierra ensued in which Officer Smith asked Sierra if he was transporting "nar-

---

1. On appeal, Sierra limits his arguments to the federal Constitution. Accordingly, our analysis of the constitutionality of the police officer's conduct will be confined exclusively to the federal Constitution. See State v. Ashe, 745 P.2d 1255, 1257 n. 2 (Utah 1987); State v. Hygh, 711 P.2d 264 (Utah 1985) (Zimmerman, J., concurring); State v. Larocco, 742 P.2d 89 (Utah Ct. App.1987) (Billings, J., concurring and dissenting).

cotics, weapons, or anything illegal." Sierra responded, "no, no. Do you want to look in my *trunk*?" (Emphasis added.) Sierra, after recovering his keys, opened the trunk of the car himself. Officer Smith and his requested back-up officer then searched the trunk of the car, discovering a bag, toilet articles, and a brand new hydraulic floor jack. Officer Smith, for some reason that is not clear from a review of the record, shifted his attention to the front passenger area of the car. Officer Smith opened the door of the car and, "on the side of the front seat, the passenger side, between the seat and the door," found a wallet. Officer Smith opened the wallet. It contained an alien card with defendant's name, Sigifredo Eduardo Sierra Parra, on it, giving a birthdate of April 10, 1961; and a New York driver's license. After asking Sierra to explain the discrepancy in the name and birthdate given by him, and those given on the alien card and driver's license, Officer Smith began looking underneath the car and noticed the gas tank had recently been removed and that it hung down further from the car than normal. Officer Smith then retrieved the key from the trunk, and "put the keys in the ignition to seek how much gas was in the tank." The gas gauge "immediately went past full." Officer Smith then tapped along the bottom of the gas tank, concluding the tank "was nowhere near full." Officer Smith ultimately arrested Sierra for furnishing false information regarding Sierra's name and birthdate.

Incident to his arrest, Sierra's car was impounded and transported to Cedar City, Utah. Officer Smith obtained a search warrant to search the car, based upon the suspicious nature of the gas tank. The search revealed 15 packages totaling 31.3 pounds of 96% pure cocaine in a secret compartment located above the gas tank. Consequently, Sierra was charged with possession of a controlled substance with intent to distribute.

Sierra filed a motion to suppress the cocaine confiscated during the search of the car, arguing the initial stop of his car violated his fourth amendment rights. At the suppression hearing, Sierra contended that Officer Smith had not stopped the car to issue a traffic citation, but rather that the stop was a pretext to search for evidence of drug trafficking. He argued, therefore, that all subsequently obtained evidence must be suppressed as unconstitutionally tainted. The state argued that Officer Smith's initial stop was valid and that any search was, in any event, based on "defendant's voluntary volitional consent to search." The trial court denied Sierra's motion to suppress the cocaine, finding that Officer Smith's stop of Sierra's vehicle was not a pretext and that Officer Smith, after the stop, had reasonable suspicion to believe Sierra was engaged in criminal activity. The court made no findings on the consent issue. Sierra subsequently pled no contest to the charge and was sentenced to an indeterminate term of 1 to 15 years in the Utah State Prison. This appeal followed.

The issues on appeal are whether Officer Smith's initial stop of Sierra was constitutional under the fourth amendment and, if not, whether Sierra's subsequent consent to the search of the car's trunk purged the taint of the otherwise unconstitutional stop. The trial judge is in the best position to assess the witnesses' credibility in a motion to suppress proceeding. *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987). Accordingly, we will not disturb the trial court's factual evaluation underlying its decision to grant or deny a motion to suppress unless it is clearly erroneous. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987); *Ashe*, 745 P.2d at 1258.

## I.

### "Stop" as a Fourth Amendment Seizure

The fourth amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV. Accordingly, it functions to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *State v. Trujillo*, 739 P.2d 85, 87

(Utah Ct.App.1987) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980)).

 The fourth amendment applies to brief investigatory stops that fall short of official traditional arrests. *Terry v. Ohio*, 392 U.S. 1, 16–17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). The stopping of an automobile and the consequent detention of its occupants constitute a "seizure" within the meaning of the fourth amendment, despite the fact that the purpose of the stop is limited and the resulting detention quite brief. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *State v. Cole*, 674 P.2d 119, 123 (Utah 1983). Therefore, Officer Smith's stop of Sierra must comport with the constitutional protections afforded by the fourth amendment.

The constitutionality of governmental seizures is judged by balancing their intrusion into the privacy of individuals' lives against their promotion of the legitimate governmental interest of crime prevention and detection. *See Trujillo*, 739 P.2d at 87. Balancing these legal principles, the United States Supreme Court has reasoned that a police officer, in appropriate circumstances and in an appropriate manner, may approach a person to investigate suspected criminal conduct notwithstanding the lack of probable cause to make an arrest. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880; *Trujillo*, 739 P.2d at 87.

Officer Smith's stop of Sierra can be constitutionally justified on one of two alternative grounds. First, it could be based on specific, articulable facts which, together with rational inferences drawn from those facts, would lead a reasonable person to conclude Sierra had committed or was about to commit a crime. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879; *State v. Christensen*, 676 P.2d 408, 412 (Utah 1984); *Trujillo*, 739 P.2d at 88. Second, the stop could be incident to a lawful citation for the traffic violation of driving unlawfully in the left lane. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result [the

United States Supreme Court] has consistently refused to sanction." *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80; *State v. Elliott*, 626 P.2d 423, 425 (Utah 1981).

## II.

### Reasonable Suspicion

 Section 77-7-15 is the statutory codification of the constitutionally mandated "reasonable suspicion" standard for a constitutional stop. Utah Code Ann. § 77-7-15 (1982); *Trujillo*, 739 P.2d at 88. This section provides that

A peace officer may stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand a name, address and an explanation of his actions.

Under this statute, a "brief investigatory stop of an individual by police officers is permissible when the officers 'have a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity.'" *State v. Carpena*, 714 P.2d 674, 675 (Utah 1986) (per curiam) (quoting *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985)); *Christensen*, 676 P.2d at 412; *Trujillo*, 739 P.2d at 88.

 In assessing whether a seizure of a vehicle is supported by the constitutionally mandated reasonable suspicion, trial courts are required to consider the totality of the circumstances confronting the officer at the time of the seizure. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Mendoza*, 748 P.2d at 183. In making this assessment, the "avoidance of eye contact can have no weight whatsoever." *United States v. Pacheco*, 617 F.2d 84, 87 (5th Cir.1980). "Reasonable suspicion should not turn on opthalmological reactions of the appellant." *Id.* (quoting *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977)). *See Mendoza*, 748 P.2d at 184. Nonetheless, the officer is entitled to assess the facts facing him (or her) in light of his experience. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884–85, 95 S.Ct. 2574, 2581, 45 L.Ed.2d

607 (1975); *Mendoza,* 748 P.2d at 183; *Trujillo,* 739 P.2d at 88–89.

The "reasonable suspicion" principle is best comprehended by a comparison of cases which have held that the stop of a vehicle was unreasonable under the fourth amendment.

In *Carpena,* a police officer, patrolling a neighborhood in which a number of burglaries had recently occurred, observed a slowly moving vehicle with Arizona license plates at 3:00 a.m. The officer had not witnessed any traffic offenses and had received no reports of any criminal activity in the area. The car pulled into the driveway of a house where one of the occupants of the car resided. Once in the driveway, the police officer seized the individuals to investigate the circumstances. Our supreme court held the investigatory stop unconstitutional because there were no objective facts on which to base a reasonable suspicion that the occupants of the car were engaged in or about to engage in any criminal activity. *Carpena,* 714 P.2d at 675.

In *Mendoza,* two United States Immigration Service border patrol officers observed a black Mustang traveling northbound on Interstate 15 at 4:50 a.m. They concluded the car warranted a closer look because the occupants appeared to be of Spanish origin. The officers then followed the Mustang at a high speed. They observed that the defendants' vehicle did not leave the left lane despite the officers' rapid approach. The officers also noticed that the Mustang bore California license plates. Eventually, the Mustang pulled over to the right lane where its movements appeared "jerky" to the officers. Moreover, the defendants of the car behaved "nervously" and avoided eye contact with the officers. The officers decided to pull the Mustang over and question the defendants concerning their citizenship. At the suppression hearing, the officers testified that they relied on the following facts to support their reasonable suspicion that the vehicle and its occupants were engaged in illegal activity: (1) the

apparent "Latin descent" of the occupants of the Mustang; (2) the route of travel; (3) the time of day; (4) the time of year; (5) the California license plates; (6) the erratic driving pattern; and (7) the nervous behavior of the occupants.[2] Our supreme court held that that "the facts in this case do not support a reasonable suspicion that the defendants were engaged in illegal activity," *Mendoza,* 748 P.2d at 184, and therefore that the defendants' fourth amendment rights were violated. *Id.*

■ Applying the foregoing authority to the facts of this case, the totality of the circumstances confronting Officer Smith prior to seizing Sierra's car does not support a reasonable suspicion that Sierra was engaged in or about to be engaged in criminal activity. Officer Smith testified at the preliminary hearing that he decided to "go after [Sierra's] vehicle and check [it] more closely" and requested back-up assistance based solely upon Sierra's purported "suspicious nature and the way [Sierra] reacted when he [saw] [me]." As we have stated, Sierra's failure to make eye contact with Officer Smith is afforded no weight in determining if he had a reasonable suspicion to conduct an investigatory stop of Sierra. *See Pacheco,* 617 F.2d at 87; *Mendoza,* 748 P.2d at 184. Such nervous conduct on Sierra's part when confronted by a Utah Highway Patrol trooper is consistent with innocent as well as with criminal behavior. *See Trujillo,* 739 P.2d at 89. Sierra did not try to evade Officer Smith, nor did he attempt to conceal anything when pursued by Officer Smith. *See Mendoza,* 748 P.2d at 184. Sierra changed lanes and pulled over to the emergency lane upon Officer Smith's signal.

In short, Officer Smith failed to identify specific, articulable facts which would lead a reasonable person to conclude Sierra had committed or was about to commit a crime, such as drug trafficking or transportation of illegal aliens. We are convinced Officer Smith's decision to seize Sierra was based

---

**2.** We note the striking similarity between the facts articulated by the officers in *Mendoza* and the facts relied on by Officer Smith in the instant case. If the officers in *Mendoza* had claimed they had pulled the car over for failure to drive in the right lane, and they apparently could have done so, we believe *Mendoza* would be controlling authority here.

on nothing more than an unconstitutional "hunch." The fact that his "hunch" proved correct is "perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, *ex post facto,* a seizure that was not objectively reasonable at its inception." *See United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986).

### III.

#### Stop Incident to a Traffic Violation

The State, however, argues that Officer Smith's initial stop of Sierra was constitutional because it was incident to a lawful stop for a traffic violation, i.e., driving unlawfully in the left lane. We disagree.

In establishing the constitutional standard to stop a particular automobile, the United States Supreme Court has clearly denied an officer the right to randomly stop cars on public roads. *See Prouse,* 440 U.S. at 662, 99 S.Ct. at 1400; *State v. Gibson,* 665 P.2d 1302, 1304 (Utah 1983) (quoting *Prouse,* 440 U.S. at 662, 99 S.Ct. at 1400). In reaching this conclusion, the Court has stated:

> Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio, supra,* recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

*Prouse,* 440 U.S. at 663–65, 99 S.Ct. at 1401–02.

A police officer *may,* however, stop an automobile for a traffic violation committed in the officer's presence. *See, e.g., Braxton v. State,* 234 Md. 1, 197 A.2d 841, 844 (1964); *Anderson v. State,* 444 P.2d 239, 241 (Okla.Crim.1968). However, it is impermissible for law enforcement officers to use a misdemeanor arrest as a pretext to search for evidence of a more serious crime. *See United States v. Millio,* 588 F.Supp. 45, 49 (W.D.N.Y.1984). *Ac-* cord *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *Taglavore v. United States,* 291 F.2d 262, 265 (9th Cir.1961).

> The violation of a constitutional right by a subterfuge cannot be justified.... Were the use of misdemeanor arrest warrants as a pretext for searching people suspected of felonies to be permitted, a mockery could be made of the Fourth Amendment and its guarantees. The courts must be vigilant to detect and prevent such a misuse of legal processes.

*Taglavore,* 291 F.2d at 266.

In determining whether a stop for a traffic violation and subsequent arrest is a pretext, the totality of the circumstances governs. *Brignoni–Ponce,* 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10. In making this determination the subjective intent of the officer is irrelevant. "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136 (1978)). *Accord Morane v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986); *United States v. Carson,* 793 F.2d 1141, 1149 (10th Cir.1986) (quoting *Morane v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986)). The Supreme Court, almost without exception, has emphasized *objectivity* in evaluating purported fourth amendment violations.

> [T]he Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him. The language of the Amendment itself proscribes "unreasonable" searches and seizures. In *Terry,* the Court emphasized the objective aspect of the term reasonable.... And in making that assessment it is imperative that the facts be judged against an objective standard; would the facts available to the officer at the moment of the seizure or the search "warrant [an officer]

of reasonable caution in the belief" that the action taken was appropriate?

*Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) (citations omitted).

Thus, in determining whether Officer Smith's stop of Sierra for driving in the left lane was an unconstitutional pretext, we focus on whether a hypothetical reasonable officer, in view of the totality of the circumstances confronting him or her, *would* have stopped Sierra to issue a warning for driving in the left lane. The proper inquiry does not focus on whether the officer *could* validly have made the stop. This analysis is congruent with that developed by other jurisdictions under the fourth amendment.

In *United States v. Smith,* 799 F.2d 704 (11th Cir.1986), the sole issue confronting the Eleventh Circuit Court of Appeals was the reasonableness of the initial stop of the appellants' vehicle. The facts confronting the officer at the time of the arrest were as follows. At 3:00 a.m. on the morning of June 5, Trooper Vogel observed a car whose occupants matched a drug courier profile. The car was traveling 50 miles per hour, displayed out-of-state tags, and the occupants did not look at the officer as they passed. Trooper Vogel, based on these factors, believed the appellants' vehicle was transporting drugs. Consequently, Officer Vogel followed the vehicle for about one mile when he noticed the car "weaving"; he observed the car's right wheels cross over the white line about six inches into the emergency lane and weave. Officer Vogel admitted that he did not stop the car because it "weaved," but rather stopped it to investigate his suspicion that the appellants were transporting drugs. A subsequent search of the car revealed one kilogram of cocaine in a satchel. The district court denied the appellants' motions to suppress the cocaine on the ground that the stop of their vehicle was unreasonable. On appeal, the Eleventh Circuit reversed, concluding that

in determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation. Because the evidence suggests that a reasonable officer would not have stopped the appellants without an invalid purpose to obtain evidence of additional criminal activity, we reverse.

*Smith,* 799 F.2d at 708 (emphasis in the original). *Accord Diggs v. State,* 345 So.2d 815 (Fla.Ct.App.1977); *State v. Blair,* 691 S.W.2d 259 (Mo.1985). *See also State v. Holmes,* 256 So.2d 32, 34 (Fla.Ct.App.1971) (a traffic violator is not immune from the seizure of evidence of a more serious crime "provided that the gravity of the traffic offense is such that any citizen would routinely be stopped for it if seen committing the offense by a traffic officer on routine patrol"); *Urquhart v. State,* 261 So.2d 535, 536 (Fla.Ct.App.1972) ("The motive of the arresting officer does not immunize a suspected motorist from an arrest to which any of us would be subject were we seen driving as [the defendant] drove.").[3]

Commentators have acknowledged the necessity to have some legal framework to protect individuals from pretextual misdemeanor traffic arrests:

Given the fact, as [the dissenters in *United States v. Robinson,* 471 F.2d 1082 (D.C.Cir.1972) (Wilkey, J., dissenting)] noted, that "in most jurisdictions and for most traffic offenses the determination of whether to issue a citation or effect a full arrest is discretionary with the officer," and that "very few drivers can traverse any appreciable distance without

---

3. Courts which have not analyzed claimed pretextual traffic stops under the objective approach have considered cases factually distinguishable from the instant case. These cases have involved valid preexisting arrest warrants, *see, e.g., State v. Davis,* 35 Wash.App. 724, 669 P.2d 900 (1983); *People v. Holloway,* 416 Mich. 288, 330 N.W.2d 405 (1982), *cert. denied,* 461 U.S. 917, 103 S.Ct. 1900, 77 L.Ed.2d 288 (1983), or cases where the traffic violation was clear cut and left little room for abuse of discretion on the part of the officer. *See, e.g., United States v. Mahanna,* 461 F.2d 1110 (8th Cir.1972); *Busby v. United States,* 296 F.2d 328 (9th Cir.1961); *State v. Sanders,* 154 Ga.App. 305, 267 S.E.2d 906 (1980); *Braxton v. State,* 234 Md. 1, 197 A.2d 841 (1964); *Anderson v. State,* 444 P.2d 239 (Okla.Crim.1968). *But see Shackleford v. State,* 473 P.2d 330 (Okla.Crim.1970); *State v. Tucker,* 286 Or. 485, 595 P.2d 1364 (1979).

violating some traffic regulation," this [pretextual traffic stop] is indeed a frightening possibility. It is apparent that virtually everyone who ventures out onto the public streets and highways may then, with little effort by the police, be placed in a position where he is subject to a full search. Nor is one put at ease by what evidence exists as to police practices in this regard; it is clear that this subterfuge is employed as a means for searching for evidence on the persons of suspects who could not be lawfully arrested for the crimes of which they are suspected.

5 LaFave, Search and Seizure § 5.2(e) (2d ed. 1987) (footnotes omitted). We agree and, therefore, we hold that in traffic violation stops, in balancing the rights of individuals to be free from arbitrary interference by law enforcement officers and the government's interest in crime prevention and public protection, if a hypothetical reasonable police officer would not have stopped the driver for the cited traffic offense, and the surrounding circumstances indicate the stop is a pretext, the stop is unconstitutional.

▮ Having delineated the standard by which we assess the constitutionality of a police officer's stop of an automobile for a traffic violation, we now must determine whether Officer Smith's stop of Sierra was valid. Officer Smith issued a warning to Sierra for violating Utah's left lane statutes. These statutes provide in pertinent part:

(1) On all roadways of sufficient width, a vehicle shall be operated upon the right half of the roadway, except:

(a) when overtaking and passing another vehicle proceeding in the same direction....

Utah Code Ann. § 41–6–53 (1987). This regulation is further clarified in another provision, which provides:

The overtaking and passing of vehicles proceeding in the same direction is subject to the following provisions:

(1) The operator of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left at a safe distance and may not again drive to the right side of the roadway until safely clear of the overtaken vehicle.

Utah Code Ann. § 41–6–55 (1987). "The overtaking vehicle shall return to an authorized lane of travel *as soon as practical....*" Utah Code Ann. § 41–6–57(3) (1987) (emphasis added). These statutes leave much room for discretion as to when a driver should legally return to the right lane.

Officer Smith observed Sierra traveling 56 miles per hour in the left lane. He testified Sierra continued in the left lane for 40 to 50 seconds, at which time Officer Smith signaled Sierra to pull over. During this time, Sierra passed two vehicles that were in the right lane. Officer Smith, on direct examination, testified that Sierra "had a couple opportunities to get into the right lane." He also stated that "as we passed two vehicles, I decided to stop this vehicle and explain to him our left-lane law, giving him a warning for traveling in the left lane and not yielding *immediately.*" (Emphasis added.)

We are persuaded that a reasonable officer would not have stopped Sierra's car and issued the warning citation for traveling in the left lane but for his desire to investigate his previously-formed hunch of other criminal behavior. Sierra did not have a statutory duty to return to the right lane *immediately.* Rather, Sierra, under the applicable statutes, could not return to the right side of the roadway until safely clear of the overtaken vehicle, and as soon as practical. Because Officer Smith pulled Sierra over after 40 to 50 seconds, we do not know if and when Sierra would have yielded to the right lane. Furthermore, there is no testimony in the record describing the speed, location, and spacing of the automobiles as Sierra passed them. Consequently, we are unable to assess whether Sierra even violated Utah's left-lane provisions. The trial judge did not find that Sierra had violated any traffic statutes.

Our conclusion that a reasonable officer would not have stopped Sierra for traveling in the left lane is buttressed by the events preceding Officer Smith's seizure of Sier-

ra's automobile. As previously stated, Officer Smith was suspicious of Sierra before he observed Sierra commit any purported traffic violation. He had radioed for a computer check of the car's license plate but found it was not stolen. Nevertheless, he radioed for back-up assistance and exceeded the posted speed limit to catch Sierra. Based on the foregoing, we are persuaded that Officer Smith used the traffic arrest as a pretext to discover evidence of illegal activity to support his "hunch."

## IV.

### Consent

Having determined that Officer Smith's stop of Sierra was unconstitutional, we next consider if Sierra's consent to the search of the trunk of his car was sufficient to purge the taint of the illegal prior stop.

In making this determination, we must inquire "whether, granting establishment of primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). We note that even though evidence would not have come to light *but for* prior illegal police misconduct, this evidence is not inadmissible per se. *Id.* The United States Supreme Court has rejected a "but for" exclusionary rule for evidence seized as a result of prior illegality. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). *See also United States v. Carson*, 793 F.2d at 1148; *United States v. Fallon*, 457 F.2d 15, 20 (10th Cir.1972).

The Supreme Court has not articulated the meaning of the terms "exploitation" or "sufficiently distinguishable" as used in *Wong Sun* with respect to a subsequent consensual search. The Tenth Circuit, however, specifically defined these terms in *Carson*. "In the context of voluntary consent," the court held that " 'exploitation of

the primary illegality' means that the police use the fruits of the primary illegality to coerce [the] defendant into *granting* his consent." *Carson*, 793 F.2d at 1148 (emphasis in original). The court also held that "in the context of voluntary consent, the 'sufficiently distinguishable' standard in *Wong Sun* refers to means of obtaining evidence substantially independent of the prior illegality." *Id.* at 1149.

By definition, then, Fourth Amendment "voluntariness" necessarily requires a finding by the district court that the evidence was obtained freely and not by police "exploitation of [the primary] illegality...." *Wong Sun, supra*, 371 U.S. at 487–88, 83 S.Ct. at 417, making the two findings mutually exclusive. Moreover, under *Wong Sun*, a search conducted pursuant to voluntary consent is a sufficiently distinguishable means of obtaining evidence to purge it of the taint of primary illegality.

*Carson*, 793 F.2d at 1150.

▮▮▮▮▮ As a general principle, a search conducted pursuant to voluntary consent is valid for fourth amendment analysis. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). "Voluntary" consent is that which was in fact voluntarily given, and not the result of "duress or coercion, express or implied." *Id.* at 248–49, 93 S.Ct. at 2058–59. The issue of whether a person's consent to a search is voluntary "is a question of fact to be determined from the totality of all the circumstances." *United States v. Sanchez–Jaramillo*, 637 F.2d 1094, 1098 (7th Cir.1980), *cert. denied*, 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).

In light of this authority, the precise legal issue which must be addressed is whether Sierra voluntarily consented to a search of the interior of his car. This search led to the discovery of his wallet containing his license and alien card, and an examination of his gas gauge. The evidence obtained by the officers' search of the interior of the car led to Sierra's subse-

quent arrest for furnishing false information and the issuance of the search warrant based upon probable cause.

The State has the burden of proving that Sierra's consent was, in fact, voluntarily given. *Bumper v. State*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). The record below merely indicates that, according to Officer Smith, Sierra offered to let him search the *trunk* of the car. The record contains no facts indicating Sierra consented to Officer Smith's search of the *interior* of the car, where he discovered the incriminating evidence. Nor does the record reveal exactly how Officer Smith went from searching the trunk of the car to searching the passenger side of the interior; how Officer Smith came to searching underneath the car and looking at the gas tank; how Officer Smith retrieved the keys to the car to verify the gas level reading; nor how Sierra responded, if at all, to Officer Smith's conduct. A translator was required for Sierra at the hearing on the motion to suppress, which supports his claim that he had difficulty communicating with Officer Smith. The district court did not find that Sierra's consent was voluntary nor did it find that the evidence procured was not obtained by the officers' "exploitation of [the primary illegality]" and "sufficiently distinguishable" from the initial illegal stop.

Accordingly, the order denying Sierra's motion to suppress the evidence is reversed, and the case is remanded for the trial court to make sufficient findings of fact and conclusions of law on the issue of consent in conformance with the principles articulated herein. *See, e.g., United States v. Carson*, 762 F.2d 833, 837 (10th Cir. 1985); *State v. Gallegos*, 712 P.2d 207, 211 (Utah 1985).

BENCH and JACKSON, JJ., concur.