**STATE of Utah, Plaintiff and Appellee,**

v.

**Robert D. LOVEGREN and Gregory Wade Southern, Defendants and Appellants.**

**No. 890350–CA.**

Court of Appeals of Utah.

Sept. 11, 1990.

Thomas H. Means, Provo, for Robert D. Lovegren.

Michael D. Esplin, Provo, for Gregory Wade Southern.

R. Paul Van Dam and David B. Thompson, Salt Lake City, for appellee.

Before BENCH, DAVIDSON,[1] and ORME, JJ.

---

**1.** Judge Davidson concurred in this opinion prior to his resignation effective September 1, 1990.

## OPINION

ORME, Judge:

After losing a critical motion to suppress, defendants each entered a conditional guilty plea to one count of possession of a controlled substance with intent to distribute, a second degree felony, under Utah Code Ann. § 58–37–8(1)(a)(iv) (1988). *See State v. Sery*, 758 P.2d 935, 939 (Utah Ct.App.1988) (upholding conditional guilty pleas). On appeal, defendants challenge the trial court's decision denying their motion to suppress. We remand for more detailed findings.

## FACTS

On June 18, 1988, a Utah highway patrolman was traveling southbound on Interstate 15 near Spanish Fork. He observed a northbound automobile traveling approximately 65 miles an hour and one-and-a-half car lengths behind another vehicle. He also noticed, apparently from a lack of the now-common shoulder restraint, that the occupants were not wearing their seatbelts. The officer made a U-turn and proceeded to follow the automobile for a short distance. Soon thereafter, the automobile exited the interstate at which time the officer activated his red light and stopped the automobile. His stated reason for making the traffic stop was that the automobile had been following too closely and the occupants were not wearing their seatbelts. The officer testified that, although he would not have stopped the vehicle just for the seatbelt violation, *see* Utah Code Ann. § 41–6–184 (1988), he stopped vehicles on a regular basis for following too closely.[2]

After stopping the automobile, the officer approached. He observed that both Lovegren and Southern were wearing sunglasses and that the automobile was cluttered with garbage. These two facts apparently made the officer suspicious. He then requested the driver, Lovegren, to produce his license and vehicle registration.

Lovegren informed the officer that the vehicle was his brother's and that he had lost his driver's license. Lovegren accompanied the officer to the police vehicle to verify that Lovegren had a valid license. The officer confirmed that Lovegren had a valid driver's license and then issued Lovegren a warning citation for following too closely and a citation for the seatbelt violation and for having a defective brake light, which the officer discovered after signaling the vehicle to stop.

While in the patrol vehicle, Lovegren apparently removed his sunglasses revealing glassy, bloodshot eyes. Lovegren's eyes indicated to the officer the possible use of drugs or alcohol. While in the vehicle, the officer asked Lovegren several questions about his trip. According to the officer, Lovegren gave evasive responses to his questioning and became very nervous as the questioning progressed.

After issuance of the citations, Lovegren and the officer returned to defendants' automobile. The officer asked the passenger, Southern, for his driver's license. Southern responded that his license had been suspended because of two DUI's. Southern removed his sunglasses at the officer's request, revealing bloodshot eyes. He then asked the defendants what they had been drinking. Lovegren said he had consumed nothing. Southern said he had consumed a "six pack."

The officer testified that he was suspicious that defendants were under the influence of alcohol and/or drugs. However, he did not conduct any sobriety tests to confirm or dispel his suspicions. Moreover, based upon the officer's various observations, including defendants' sunglasses, bloodshot eyes, cluttered car, and nervous behavior, he thought there might be drugs in the vehicle and that defendants might be smuggling drugs. On cross-examination, the officer admitted that his subsequent search was to verify this suspicion.[3]

2. The officer testified: "I write [a citation for following too closely] every chance I get when I can prove it." Moreover, he testified that during the summer months he would write one or two such citations per month.

3. The officer also testified that his search was to discover whether defendants were under the influence of drugs or alcohol. If this was truly the purpose of the search, we find it odd that the officer opted to search the vehicle rather

The facts to this point in the encounter between defendants and the officer are essentially undisputed. However, from this point on defendants' testimony concerning the facts varied greatly with that of the officer. In particular, defendants consistently testified that the officer never asked permission to search anything and that they never gave him permission to do so. Since the trial court expressly credited the contrary testimony of the police officer at least in certain respects, see note 8, infra, we will primarily recite his account of the search.

The officer testified that after seeing Southern's bloodshot eyes, he asked permission to search the vehicle and received permission from both defendants. During the search, the officer found several empty beer cans and a partially full beer can in the passenger compartment of the vehicle. Again he noticed that the interior of the car was very dirty "as if it had been lived in."

The officer then asked defendants where their luggage was. They responded that they did not have any. The officer testified that he asked permission to look in the trunk of the vehicle and received permission from Lovegren but could not immediately gain access to the trunk because Lovegren stated he did not have the key.

The officer testified that he then became concerned for his safety. He asked the defendants if they had any weapons. They responded that they did not. He then allegedly asked Southern if he would mind being patted down,[4] and Southern responded "no." During the pat down the officer felt an object in his pocket which he thought might have been a knife. He reached into the pocket and retrieved some keys with a connector that matched the ring to Lovegren's ignition key. Southern claimed that he did not know whose keys

than to administer tests to determine the influence of drugs or alcohol.

4. The patrol officer testified that he did not pat Lovegren down because he did not think he had any weapons on his person.

5. Defendants testified that the officer opened the trunk and suitcases himself without permission or assistance from the defendants.

they were. The officer testified that he suggested the keys might fit the trunk and Lovegren responded, "I guess we can try."

The officer testified that Lovegren then took the keys and attempted to open the trunk. On cross-examination, the officer admitted that he may have opened the trunk himself after Lovegren had feigned inability.[5] The trunk contained a bag of dirty laundry, two suitcases, and other items. The officer testified that he asked Lovegren if he could look in the suitcases. According to the officer, Lovegren stated that the bags were not his, but that the officer could look in them.

The officer testified that Lovegren then took one of the suitcases out of the trunk, placed it on the ground, and opened it, revealing the contents including clothes and a cookie box. Lovegren allegedly showed the officer everything but the contents of the cookie box.[6] The officer then grabbed the cookie box and squeezed it so that he could look inside. Underneath a row of cookies, the officer saw a baggie containing a white powdery substance.

After the officer had looked in the box, Lovegren grabbed it and said "you can't have that. That's mine." He then ran to the car, sat in the car for a minute, and then tossed the box to Southern. Southern caught the box and ran up the road. Both defendants were apprehended and arrested for possessing a controlled substance with intent to distribute.

Defendants moved to suppress the evidence discovered by the officer claiming the search was illegal. The trial court heard evidence from both sides and denied defendants' motion from the bench. The court made no written findings and very few oral findings. Defendants appeal the denial of their motion to suppress.

6. Defendants testified that the officer himself removed the suitcase without permission and began to search through it. At that point, Lovegren assisted the officer, attempting to hide the cookie box from the officer's view.

## FINDINGS GENERALLY

Findings of fact underlying a trial court's decision to deny a motion to suppress will not be disturbed on appeal unless clearly erroneous. *State v. Marshall*, 791 P.2d 880, 882 (Utah Ct.App.1990). Findings are clearly erroneous only when they are against the clear weight of the evidence or when the appellate court is convinced that a mistake has been made. *Id.*

Though we accord substantial deference to trial court decisions in these kinds of cases, we can only do so when the findings disclose "the steps by which the ultimate conclusion on each factual issue was reached." *Id.* at 882 n. 1 (quoting *Rucker v. Dalton*, 598 P.2d 1336, 1338 (Utah 1979)). The Utah Rules of Criminal Procedure require such findings "[w]here factual issues are involved in determining [the] motion." Utah R.Crim.P. 12(c). This court has consistently recognized that the issues presented in search and seizure cases are highly fact sensitive. *See, e.g., Marshall*, 791 P.2d at 881; *State v. Sierra*, 754 P.2d 972, 973 (Utah Ct.App.1988), *rev'd on other grounds, State v. Arroyo*, 796 P.2d 684 (Utah 1990). Thus, detailed findings are necessary to enable this court to meaningfully review the issues on appeal.

## INADEQUACY OF FINDINGS

Defendants challenged the seizure in this case on several theories in the court below. They argued that the initial stop was a pretext to search for drugs. They argued that, having issued the citation, the officer did not have any articulable suspicion which justified the continuing investigation and search.[7] They argued that the pat-down was not justified. Finally, defendants argued that they never gave consent to the search.

The state's primary justification for the search advanced to the trial court was that defendants had abandoned any interest in the areas and items searched by the officer. It did not argue consent as a justification for the search. The state also argued that the stop was valid and that the officer had a reasonable suspicion that defendants were under the influence of alcohol and/or drugs which justified a search for those items.

■ The trial court made no written findings concerning the multiple issues raised by the parties. Moreover, the court's oral findings were very sketchy[8] and entirely failed to address critical issues. This is so even assuming the court found defendants consented to the search, a matter which is far from clear,[9] notwithstanding that the state had not argued this theory. The other issues not addressed by adequate findings include: 1) whether the officer had an articulable suspicion of criminal activity to justify continued detention beyond the issuance of a citation; 2) whether defendants' consent to search, if they did consent, purged the taint of any improper police conduct; and 3) whether defendants had abandoned the items searched. Moreover, concerning the validity of the stop, the court did not make actual findings but only the unadorned conclusion that the officer "made a proper

7. The state argues on appeal that defendants failed to raise their unreasonable detention argument below. We disagree. Although the argument below may not have been as artfully presented as it could have been, defendants were clearly arguing, among other things, that the state lacked any articulable suspicion to keep them beyond the issuance of the citation.

8. The court's oral findings were as follows:
   I am inclined to believe the officer in this matter. As far as the court is concerned in this matter he made a proper stop. He had a right to concern himself under that situation for his own safety. I don't think you have to wait until a[n] officer gets shot or a gun

   exposed or anything else and be concerned about your own safety....
   It is the Ruling of this court that he has the right to make the pat down search and concern himself with whether or not what he felt was a weapon. I think his testimony from that point forward the keys were taken by the driver, Mr. Lovegren took them back and he opened the suitcase. Then the attitude toward the cookie box was sufficient I think to establish a strong suspicion in connection with anything else. I will deny the Motion.

9. *See* note 8, *supra.*

stop." [10]

■ The trial court's findings on the various issues are inadequate to provide meaningful review on appeal.[11] The facts were greatly disputed at the suppression hearing and thus "[t]he record does not clearly and uncontrovertedly support the trial court's" ultimate decision. *Acton v. Deliran,* 737 P.2d 996, 999 (Utah 1987). Though the decision not to suppress may have been correct, the critical "issues are for the trial court to decide and ... the findings of fact must reveal how the court resolved each material issue." *Id. See also United States v. Guzman,* 864 F.2d 1512, 1521 (10th Cir.1989) ("It is 'not the function of the appellate court to try the facts or substitute for the trial court in the determination of factual issues.' ") (quoting *Sabol v.*

*Snyder,* 524 F.2d 1009, 1011 (10th Cir. 1975)).

We accordingly remand for more detailed findings. *See, e.g., Sierra,* 754 P.2d at 981.

BENCH and DAVIDSON, JJ., concur.

10. Although the court did not make any factual findings concerning the validity of the stop, the facts concerning that issue are essentially undisputed and the court's conclusion in that regard appears correct.

In evaluating whether the stop of an automobile is a pretext, the prior focus of this court has been on "whether a hypothetical reasonable officer, in view of the totality of the circumstances confronting him or her, *would* have stopped [defendant] to issue [the citation]." *State v. Sierra,* 754 P.2d 972, 978 (Utah Ct.App.1988). While the individual officer's own practice may well be probative of what the hypothetical reasonable officer would do under the circumstances, his characterization of his intent at the time is essentially irrelevant. *See id.* at 977.

Defendants did not produce any evidence to suggest that the hypothetical reasonable officer would not have stopped defendants in this case. In fact, the only testimony on the issue was that of the officer himself. When confronted on cross-examination, the officer stated: "We write [citations for following too closely] on a regular basis." Moreover, he stated: "I write [a citation] every chance I get when I can prove it." Finally he stated: "Oh usually in the summer we will write ... one or two a month I guess." This unrebutted testimony suggests that officers in the area routinely stop drivers for following too closely. *See United States v. Guzman,* 864 F.2d 1512, 1518 (10th Cir.1988) (distinguishing routine stops from pretext stops). Defendants failed to produce any contradictory evidence and in the absence of such evidence, the stop appears to have been valid.

To support their pretext argument, defendants cite *State v. Arroyo,* 796 P.2d 684 (Utah 1990). In *Arroyo,* the Utah Supreme Court affirmed the trial court's determination that a stop was a pretext to search for drugs. *Id.* at 687–688. The

alleged violation in that case was also following too closely. However, that case is readily distinguishable. First, the trial court found that no violation had occurred because the vehicle was traveling approximately nine car lengths behind the car in front. *Id.* at 688 n. 3. Second, the officer's testimony clearly indicated that the purpose for the stop was to investigate a suspicion wholly unrelated to the alleged violation. *Id.* The stop in *Arroyo* is a classic pretext stop.

The undisputed facts in this case indicate that defendants' automobile was traveling 65 miles an hour and one-and-a-half car lengths behind the car in front. These facts present a clear violation of the statute. *See* Utah Code Ann. § 41-6-62 (1988). Moreover, the undisputed facts do not suggest that the officer had any other purpose for stopping the vehicle except to issue a citation for following too closely and for failure to wear seatbelts. The facts in this case simply do not indicate that the stop was "a pretext to search for evidence of a more serious crime." *Sierra,* 754 P.2d at 977. Therefore, the trial court's conclusion that the stop was proper appears to be correct.

11. The trial court's inadequate findings also placed appellate counsel at a disadvantage in framing and developing their arguments on appeal. Both sides recognized this difficulty at oral argument and both sides suggested remand for more detailed findings as an appropriate remedy. By subsequent correspondence, defendants have taken the position that *State v. Robinson,* 797 P.2d 431 (Utah Ct.App.1990), makes remand unnecessary and entitles them to reversal. We are not persuaded. Review of the *Robinson* opinion confirms that the trial court in that case made adequate, detailed findings that facilitated meaningful appellate review of the trial court's legal conclusions.