**STATE of Utah, Plaintiff and Appellee,**

v.

**Lisa SYKES, Defendant and Appellant.**

**No. 910554–CA.**

Court of Appeals of Utah.

Oct. 19, 1992.

Roger K. Scowcroft and Joan C. Watt (argued), Salt Lake Legal Defender Ass'n, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Atty. Gen., and Todd A. Utzinger, Asst. Atty. Gen. (argued), Salt Lake City, for plaintiff and appellee.

Before BENCH, P.J., and GREENWOOD and JACKSON, JJ.

OPINION

GREENWOOD, Judge:

Defendant Lisa Sykes appeals her conviction for possession of a controlled substance, a third degree felony, in violation of Utah Code Annotated section 58–37–8(2)(a)(i) (Supp.1991), claiming that the trial court erred in denying her motion to suppress. We reverse.

FACTS

On appeal we state the facts involving the seizure of evidence in detail because

the issue presented is fact sensitive. *State v. Marshall*, 791 P.2d 880, 882 (Utah App.), *cert. denied*, 800 P.2d 1105 (Utah 1990).

On the night of November 17, 1990, Deputy Keith Stephens of the Salt Lake County Sheriff's Office was watching a house located at 855 South 1500 West in Salt Lake City. Deputy Stephens was conducting the surveillance because of (1) neighbors' complaints regarding suspicious activities at the house; (2) information from a confidential informant; and (3) Deputy Stephens's purchase of cocaine in an undercover capacity in the general area. That night, after Deputy Stephens had been watching the house for about fifteen minutes, defendant drove up, parked, and entered the house. Approximately three minutes later, defendant returned to her car and drove off.

Deputy Stephens followed her in his car. After traveling some distance, defendant pulled over and Deputy Stephens approached her.[1] He identified himself and asked defendant for identification and the vehicle's registration. Defendant had neither, but gave Deputy Stephens her name and date of birth. Deputy Stephens then returned to his vehicle where he checked defendant's driver's license status and ran a warrants check. The warrants check revealed that defendant had several outstanding warrants.

Deputy Stephens had defendant accompany him to his car where he questioned her about drug activity at the house she had just left. Defendant denied having any knowledge about narcotics trafficking at the home. Deputy Stephens then informed defendant she was under arrest for the outstanding warrants. At that point, defendant offered to divulge any information she had about the house, but Deputy Stephens refused the offer, stating he could not trust her. He then summoned a vice officer to assist in arresting defendant and impounding her vehicle. Deputy Stephens searched defendant's car and found a grocery store receipt under the front seat. Inside the folded receipt was a small paper that contained a white powdery substance. Through a field-test Deputy Stephens determined the powder was cocaine. The state laboratory later confirmed this identification.

Defendant moved to suppress all evidence seized from her car on the grounds that the detention and search of her vehicle violated her rights under the Fourth Amendment to the United States Constitution. Deputy Stephens was the only person to testify at the suppression hearing. The trial court denied the motion without comment. Defendant entered a conditional plea of nolo contendere, preserving her right to appeal the court's denial of her motion to suppress, pursuant to *State v. Sery*, 758 P.2d 935, 937–40 (Utah App. 1988).

## ISSUES

On appeal defendant argues that the court erred in denying her motion to suppress because (1) Deputy Stephens had no reasonable articulable suspicion to justify stopping her; and (2) the scope of the detention exceeded that permitted by law.

## STANDARD OF REVIEW

◼ In *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987), the court stated that a trial court's determination of reasonable suspicion should not be overturned unless it is clearly erroneous.[2]

---

1. The record indicates and the State concedes in its brief, that Deputy Stephens stopped defendant.

2. *But see State v. Ramirez*, 817 P.2d 774, 782 (Utah 1991), in which the supreme court suggests a two-step process of analysis in reviewing admissibility of evidence, where the appellate court will "defer to the trial court's fact-finding role by viewing the facts in the light most favorable to the trial court's decision" and then review for correctness "whether these facts are sufficient to demonstrate reliability." Similarly, some panels of this court have held that ultimate conclusions of fact drawn from preliminary factual findings are subject to a "correction of error" standard of review in cases involving voluntary consent, while other panels have held that a "clearly erroneous" standard should be applied. In *State v. Carter*, 812 P.2d 460, 468–69 n. 8 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), we invited the Utah Supreme Court to clarify the division among different panels of

## ANALYSIS

■ When a police officer stops a vehicle, a "seizure" occurs, giving rise to Fourth Amendment protections. *State v. Holmes,* 774 P.2d 506, 507 (Utah App.1989). The parties agree that a level two encounter, as described in *State v. Deitman,* 739 P.2d 616, 617–18 (Utah 1987), occurred in this case, requiring reasonable suspicion. *Deitman* described three levels of encounters between police and citizens as follows:

> (1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.

*Id.,* (quoting *United States v. Merritt,* 736 F.2d 223, 230 (5th Cir.1984), *cert. denied, Hartsel v. United States,* 476 U.S. 1142, 106 S.Ct. 2250, 90 L.Ed.2d 696 (1986)).

■ To pass muster under the Fourth Amendment, the seizure must be based on specific articulable facts which, together with rational inferences drawn from them, would lead a reasonable person to conclude defendant had committed or was about to commit a crime. *State v. Trujillo,* 739 P.2d 85, 88 (Utah App.1987).

In *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), the Court stated:

> [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion.... [I]n making that assessment it is imperative that the facts be judged against an objective standard.... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction.

The requirement of reasonable suspicion has also been codified in Utah Code Annotated section 77–7–15 (1990).

> A peace officer may stop any person in a public place when he has reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address and an explanation of his actions.

Under this section, a police officer may detain an individual if he or she has an articulable suspicion that criminal activity has occurred or is occurring. *Deitman,* 739 P.2d at 617–18. The courts have acknowledged that police officers, by virtue of their specialized experience, can sometimes recognize illegal activity where ordinary citizens would not. *State v. Miller,* 740 P.2d 1363, 1366 n. 2 (Utah App.), *cert. denied,* 765 P.2d 1277 (Utah 1987).

■ There is no bright line test for what constitutes reasonable suspicion. *State v. Steward,* 806 P.2d 213, 215 (Utah App. 1991). Courts will engage in a totality of the circumstances analysis to determine whether there was a reasonable suspicion of criminal conduct. *Id.; United States v. Sokolow,* 490 U.S. 1, 6, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). That analysis "must be based upon all the circumstances and must 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.'" *Steward,* 806 P.2d at 215 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

■ Although the trial court did not enter written findings of fact and conclusions

---

this court in cases involving voluntariness of consent, reasonable suspicion, and when a seizure occurs. While the supreme court has thus far declined to comment, the author would prefer to apply a two-step analysis as described in *Ramirez* and *Carter,* to the issue of whether reasonable suspicion existed in this case. It is particularly appropriate here, where the trial court made underlying findings of fact, but did not explicitly find reasonable suspicion. However, we utilize a clearly erroneous standard of review throughout in this case, because *Mendoza* is the supreme court's most recent pronouncement addressing reasonable suspicion.

of law, there was a de facto finding of reasonable suspicion inherent in the court's denial of the motion to suppress. Therefore, we look to other cases with facts similar to those before us, involving the question of reasonable suspicion of criminal activity and police detention.

In *State v. Carter*, 812 P.2d 460, 466 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), narcotics officers observed defendant deplaning from a flight arriving from Los Angeles, acting in a manner thought to be indicative of a drug carrier. The officers stopped defendant, identified themselves, and asked to examine his bag and to conduct a pat-down search of defendant's person. This court held that the encounter became a level two seizure at this point, if not sooner, and agreed with the trial court's findings that there was no reasonable suspicion of criminal activity. The trial court noted that the bulge under defendant's clothing at waist level and his failure to produce identification were inadequate circumstances for the officers to have formed a reasonable articulable suspicion. *Id.* at 466–67.

In *State v. Steward*, a S.W.A.T. team stopped and searched a vehicle entering a cul-de-sac where the police were executing search warrants on three houses. Although defendant had backed his truck up and tried to leave after the S.W.A.T. team had initially attempted to detain him, the court held the totality of the circumstances did not give rise to a reasonable suspicion that the driver of the truck was involved in criminal activity. *Steward*, 806 P.2d at 216. In addition to noting that the officers were not uniformed, the court emphasized that there were no facts to link this particular person to the suspected illegal activities in the targeted houses. His mere presence in the area was insufficient to support a reasonable suspicion. *Id.*

In *State v. Trujillo*, defendant was observed in a high crime area carrying a nylon bag in what the police officer described as a "suspicious" manner. Examining the totality of the circumstances, this court found that defendant's detention was not based upon a reasonable suspicion that he was involved in criminal activity, despite the lateness of the hour, the high-crime factor in the area, and the subsequent nervous behavior of defendant after he was stopped. *Trujillo*, 739 P.2d at 89–90. Defendant's reaction was "consistent with innocent as well as with criminal behavior," there was no contemporary criminal activity in the area, and no articulation of objective facts supporting the officer's "hunch" of criminal activity. *Id.*

Finally, in *Lemon v. State*, 580 So.2d 292 (Fla.App.1991), a police officer, while patrolling a high crime area, observed a car stop in front of an apartment complex known for drug activity. He watched the driver enter the complex, return after a brief interlude, and then leave in the car. The court held that these circumstances were insufficient to justify stopping the driver, as "they amount to no more than a bare suspicion of illegal activity." *Id.* at 293. Those circumstances likewise did not justify a pat-down search for weapons after the defendant was stopped. *Id.*

Applying these cases, the trial court clearly erred in denying the motion to suppress, because the facts do not support a reasonable suspicion that defendant was engaged in criminal activity. The only facts articulated by Deputy Stephens were that (1) the neighbors had complained about individuals entering and leaving the house at all hours; (2) Deputy Stephens previously had purchased cocaine in the general area; (3) there was unspecified information from a confidential informant; (4) there was an ongoing investigation of the house; and (5) defendant drove up to the house, entered it and left shortly thereafter. None of these factors, either singly or in the aggregate, necessarily indicate wrongdoing as opposed to innocent actions by defendant.

At the time of the arrest, any connection between defendant and illegal activity was purely speculation. The police did not know the identity of either the owner or occupants of the house, and they did not know defendant. At that point, they had no positive evidence linking the house to

illegal activity.[3] Further, defendant's mere presence in an area suspected to harbor drug activity does not give rise to reasonable suspicion that she was engaged in such activity. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). Defendant's single visit does not link her to any drug dealers. She could have as easily been at the house to visit someone who was not there, and so left quickly. In fact, Deputy Stephen's testimony indicates that defendant told him she was looking for her boyfriend.

## CONCLUSION

The trial court committed clear error in finding that Deputy Stephens had articulated facts which would support a reasonable suspicion that defendant was engaged in criminal activity. Therefore, because defendant's detention was unconstitutional, the court erred in denying her motion to suppress the evidence procured as a result of the illegal detention.

Because we reverse on the basis that the detention was illegal, we do not reach the issue of whether the scope of the detention was permissible.

Reversed and remanded for proceedings consistent with this opinion.

JACKSON, Judge (concurring):

I join the main opinion in its conclusion that the officer did not have a reasonable suspicion to stop the defendant, based on objective facts suggesting that the defendant might be involved in criminal activity. *See State v. Leonard*, 825 P.2d 664, 668 (Utah App.1991). I write separately to address appellate standard of review concerns posed by *State v. Ramirez*, 817 P.2d 774 (Utah 1991), and footnote 2 of the main opinion. Even though the main opinion correctly applies the clearly erroneous standard to the issue of reasonable suspicion because of overwhelming precedent to do so, footnote 2 of the main opinion states that it is preferable to apply a two-step approach suggested by *Ramirez*. Because the bifurcated approach has recently caused much concern over the proper standard of review to be applied to issues of admission of evidence, voluntariness of consent and reasonableness of suspicion, it is appropriate that it be addressed at this time.

## A. POLICY CONCERNS

Before reaching *State v. Ramirez*, 817 P.2d 774 (Utah 1991), and the main opinion, I want to visit the underpinnings of standards of appellate review of trial court rulings. Since April 1990, Rule 24(a)(5) of the Utah Rules of Appellate Procedure has required the parties to include in their briefs a statement of the review standard for each issue raised. The review standard is vital to the appellate process because it limits and focuses the power the appellate court may exercise over the trial court. At the same time, the standard limits or expands the power of the trial court. Thus, policy considerations underlying standards of review include: what is the proper balance of power between two court levels, and how will judicial resources be affected.[1]

As I initially address some policy ideas, I agree with Professor Paul D. Carrington's observation—

> After millennia of inconclusive debate, none of us is entitled to be a zealot. On the other hand, decisions must be made; courts must carry on; their practices will evolve and will be changed from time to time. Inevitably, decisions and practices must rest on some shaky assumptions. Decisions will surely be better and practices will be sounder if their creators are mindful of the frail underpinnings.

Paul D. Carrington, *The Power of District Judges and the Responsibility of Courts of Appeals*, 3 Ga.L.Rev. 507, 528–29 (1969).

---

**3.** Approximately a week later, police obtained a search warrant for the house, based largely on the evidence seized from defendant.

**1.** The successful appellate advocate will acquire a clear understanding of the standards of review

and their scope. The challenge posed by review standards, to clearly define and properly apply the right standard of review, applies equally to lawyers and judges.

Even so, Carrington agrees with Professor Charles A. Wright, that some appellate courts (mainly the Federal Circuit Courts of Appeals) have been too aggressive and have overdone it. *Id.* at 527. *See* Charles A. Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn.L.Rev. 751 (1957); John F. Nangle, *The Ever Widening Scope of Fact Review in Federal Appellate Courts—Is The "Clearly Erroneous Rule" Being Avoided?* 59 Wash. U.L.Q. 409, 428 (1981) (the author, a federal trial judge, pleads that his appellate colleagues "consider the consequences of their increasing involvement in the fact finding domain of the trial court"). Each person is entitled to his or her day in court. But, this means only one trial because *there* the facts are determined by the factfinder, the trial judge's discretion is exercised and rulings on the law are pronounced.

> These initial determinations for the most part are final and binding, irrespective of impressive appellate briefs, thick volumes of records or eloquent arguments. This reality of the judicial process is an aspect of the law lost upon most laypersons and many lawyers.

Ruggero J. Aldisert, *Opinion Writing* 54 (1990).

The appellate court process consists of three basic considerations:

1. Review of the sufficiency of the evidence: does the evidence support the trial court's findings of fact?
2. Review of the trial judge's exercise of discretion: did the trial judge abuse or misuse discretion?
3. Review of the trial judge's use of law:
   a. choice of law—was the correct legal rule selected?
   b. interpretation of law—was the meaning of the rule correctly understood?
   c. application of facts to law or law to facts—was the relevant legal standard satisfied?

Appellate judges nationwide, state and federal, have expressed difficulty in selecting the proper standard of review when considering the last question above. The fact-law distinction and relationship has perplexed the United States Supreme Court since 1944 when it noted that the distinction created a "vexing" problem. *Baumgartner v. United States* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944). Commentators have lamented the fact that no litmus test exists for deciding whether a given determination is properly a finding of fact or a conclusion of law.

My research reveals that appellate judges have resolved standard of review disputes by either resorting to labels or by picking precedents that contain no rationale. This methodology may save judicial resources in the short-term (as the most efficient way to decide the case at hand) but may burden the system in the long run. I believe the following policy considerations should not be ignored: the proper balance of power and the best use of the judicial system, including concerns of the bench, bar and public.

The Federal Ninth Circuit Court of Appeals issued the only opinion I have located that reflects a serious attempt to address systemic policy considerations. The Ninth Circuit heard *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), en banc for the very purpose of resolving disputes over the proper standards of review for questions of fact, law, and mixed questions. On the perplexing issue of mixed questions, *McConney* identifies the pivotal question as: do the concerns of judicial administration favor the trial court or do they favor the appellate court? To put it another way—if efficiency, accuracy and precedential weight make it more appropriate for a trial judge to determine whether established facts fall within the relevant legal definition, we should defer. However, if the same concerns favor the appellate court, we should not defer. *Id.* I do not necessarily concur with all of *McConney,* but commend it for recognizing and addressing legitimate underlying policy concerns.

## B. *Ramirez:* THE BIFURCATED APPROACH

*State v. Ramirez*, 817 P.2d 774 (Utah 1991), supports the two-step or bifurcated standard of review, and raises the same policy concerns discussed above. As footnote 2 of the main opinion states, this standard has been espoused and embraced by some of my colleagues not only for review of admission of evidence, *State v. Gonzalez*, 822 P.2d 1214, 1216 (Utah App.1991), but also for "voluntariness" of consent and "reasonable suspicion" issues. Two cases, *State v. Vigil*, 815 P.2d 1296 (Utah App. 1991), and *State v. Carter*, 812 P.2d 460 (Utah App.1991), *cert. denied*, 836 P.2d 1383 (Utah 1992), summarize the prior opinions of panels of this court that differ on these standard of review questions. I remind the reader that conflicting panel decisions were expected to occur and contemplated by the statute creating this court. Utah Code Ann. § 78–2a–1 to –5 (1992). The judges of the court are prohibited from sitting en banc and panel decisions are to be reviewed by the Utah Supreme Court.[2] In *Carter* a panel of this court urged our supreme court to resolve the matter, but certiorari was denied.

I now turn to the examination of the bifurcated approach suggested by *Ramirez* and the proper standard of review to be applied to the following issues affected by *Ramirez* as noted in footnote 2 of the main opinion: admissibility of evidence, voluntariness of consent, and reasonableness of suspicion.

Pursuant to footnote 3 in *Ramirez*, the admissibility of evidence is a question of law and is always reviewed under a correctness standard. *Ramirez*, 817 P.2d at 781 n. 3. *Ramirez* sets up the following two step approach in reviewing admissibility of evidence questions:

> In reviewing the trial court's decision to admit, *which includes the determination of which version of facts to believe*, we review for correctness. But a correctness review necessarily incorporates a review of the trial court's resolution of factual questions and the associated determination of credibility that may underlie the decision to admit. This subsidiary determination will be overturned only if clearly erroneous.

*Id.* (emphasis added).

Thus, *Ramirez* suggests that appellate courts, in reviewing a decision to admit evidence: (1) review the "subsidiary" factual findings of the trial court under a clearly erroneous standard; and (2) review both the decision to admit and the determination of which facts to believe as legal conclusions under a "correctness" standard, (i.e., a de novo review). Under this approach the appellate court is required to label the admission of evidence question as a mixed question of fact and law. This labeling under *Ramirez* not only allows but compels the appellate court to first review the factual findings of the trial court under a clearly erroneous standard and then review the facts and any "conclusions" again under a correctness standard. This redundant and wasteful two-step approach, allowing the appellate court to avoid giving any weight to trial court findings of fact, opens the door to an alarming erosion of trial court discretion.[3]

---

**2.** The Report of the Governor's Task Force on the Judicial Article stated as follows:

The court of appeals should be prohibited by legislation from sitting en banc. A rehearing en banc is a rehearing by the entire court of a disposition by a panel of the court. Such rehearings typically are used to conform inconsistent decisions for the panels or to reverse a decision of the panel that does not have the support of the whole court. It is the conclusion of the task force that rehearings en banc do not accomplish these goals. Rather, if the issue is so complicated or controversial, or the principle of law so unsettled as to generate inconsistent panel decisions or a siz-

able minority opinion, a rehearing will tend to further complicate the issue, not resolve it. Moreover, such a case will likely be appealed to the supreme court in any event. Since the supreme court is available to resolve such matters, it is far better to use that resource in the first instance and save the time and expense of a rehearing by the court of appeals en banc.

Governor's Task Force on the Judicial Article, October 9, 1985, pp. 66–67.

**3.** Recently, the State's attorney argued for deferential appellate review of "reasonable suspicion" rulings. Otherwise, the State's policy view was that a new system of suppression hearings

### 1. Admissibility of Evidence.

*Ramirez* attempts to convert the "admissibility of evidence" standard from the "abuse of discretion" standard, *State v. Iorg,* 801 P.2d 938 (Utah 1990); *State v. Griffiths,* 752 P.2d 879, 883 (Utah 1988), which defers to trial court discretion, to a more expansive review under the correction standard. The dicta in *Ramirez,* which addresses the standard of review for admission of evidence, became the holding in *State v. Hamilton,* 827 P.2d 232, 239 (Utah 1992): "To state the matter more precisely, [than the abuse of discretion standard] we review the trial court's ruling [on admission of evidence] *as a matter of law....*" (emphasis added).

Through dicta, *Ramirez* and subsequently *Hamilton* seem to hold that all rulings regarding admission of evidence are questions of law and must be reviewed for correctness.[4] If this is the case, I believe we are seriously eroding the discretion trial judges have traditionally exercised in the conduct of trials because evidence is the essence of every trial. If *Ramirez* is based on the premise that the Utah Rules of Evidence (1983) absorbed all discretion the trial courts previously exercised and then released back to them some discretion only when specifically stated in the Rules, then I believe *Ramirez* is in error. I say this

because of the interrelationship of preliminary questions, relevancy and discretion. No proffered item of evidence can be admitted unless it satisfies the requirement of relevancy, and determinations of relevancy feature the exercise of and review of discretion. Rule 104(a) states that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [relevancy conditioned on *fact* ]. In making its determination, it is not bound by the rules of evidence except those with respect to privileges." Utah R.Evid. 104(a).

[Contemporary legal experts generally share Wigmore's view of discretion that] a large measure of 'finality' must be given to the trial judge's findings with regard to preliminary questions *and to the application of rules of evidence to particular factual situations:* An appellate court must give a trial judge "a limited right to be wrong," at least in regard to relevancy problems.... [I]n the view of modern observers, *questions of relevancy are preeminently those that should be remitted to the discretionary determination of the trial judge.*

1 J. Wigmore, *Wigmore on Evidence* § 16 (Tillers rev.1983) (emphasis added).[5] The

---

should be developed where the trial judge simply takes evidence, makes findings of fact and then automatically sends the case to an appellate panel to assess the "reasonableness" of the officer's suspicion. The State expressed concern that a bifurcated review standard will create this type of system. Further concern was expressed that the two-step review standard would cause misallocation of the defense bar. That is, if criminal defense lawyers know that a suppression ruling on reasonable suspicion is going to be reviewed without deference on appeal, it would be deficient performance of counsel not to file an appeal to obtain an "appellate" suppression hearing.

**4.** Some Utah appellate panels have applied the standard espoused by *Ramirez. E.g., State v. Gonzalez,* 822 P.2d 1214, 1216 (Utah App.1991) (whether certain evidence is relevant, and therefore admissible, is a question of law, which we review under a correction of error standard).

**5.** The reasons for characterizing evidentiary rulings as "discretionary" factual type rulings are summarized by Weinstein–Berger:

Discretion means that a trial judge has "wide scope for decision" in situations where unpredictable, unique and incalculable factors are at work. In determining a relevancy question in particular, the trial judge is generally accorded "broad discretion" in weighing the many factors that figure into the decision. A flexible approach in assessing these factors is more apt to yield a sensible result than the application of a mechanical rule.

1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence,* para. 401[01] (1992) (citations omitted). Rule 401, by furnishing no standards for the determination of relevancy, implicitly recognizes that questions of relevancy cannot be resolved by mechanical resort to legal formulae. *Id.* Accordingly, Weinstein–Berger conclude that our power of review on admissibility rulings should be "relatively limited" because the trial court has "wide" discretion in this area:

Discretion implies not only the grant of a "wide scope of discretion" to a trial judge, but also awareness that on review the appellate court will accord the trial judge "a limited

*Ramirez* characterization of all evidentiary rulings as matters of law to be reviewed virtually de novo seems at odds with the foregoing.

In any event, I believe the traditional "abuse of discretion" standard of review should be retained for most evidentiary rulings. *State v. Iorg*, 801 P.2d 938 (Utah 1990); *State v. Griffiths*, 752 P.2d 879, 883 (Utah 1988) (it is well settled that the trial court rulings on the admissibility of evidence are not to be overturned in the absence of a clear abuse of discretion); *State v. Gray*, 717 P.2d 1313 (Utah 1986); *State v. Harrison*, 805 P.2d 769 (Utah App.1991).

Even though the *Ramirez* decision deals with eyewitness identification and the two-step approach suggested in footnote 3 deals only with the admissibility of evidence, some Utah appellate court panels have attempted to apply the two-step approach not only to admissibility of evidence question, but also to search and seizure issues including voluntary consent and reasonable suspicion.[6]

### 2. Voluntariness of Consent

The watershed case finding the determination of voluntary consent a mixed question of law and fact to be reviewed under the *Ramirez* two-step approach is *State v. Vigil*, 815 P.2d 1296 (Utah App.1991). In *Vigil*, a panel of this court used precedent but offered little rationale as to why voluntariness of consent is a mixed question of law and fact as opposed to simply a finding of fact. The panel did, however, offer an analysis as to why a determination of voluntary consent should be reviewed under the new bifurcated standard espoused in *Ramirez* dicta. I find that the greater weight of precedent and sounder rationale support the conclusion that voluntariness of consent is a question of fact that should be reviewed under the clearly erroneous standard.

Footnote 8 of the decision in *State v. Carter*, 812 P.2d 460, 468 (Utah App.1991), *cert. denied* 836 P.2d 1383 (Utah 1992), details the precedential history of the standard of review for voluntariness of consent. It is clear from this review of United

---

right to be wrong," and within these limits will not reverse the judge's determination, even if it disagrees with the ruling. The appellate court's power of review is relatively limited. The test it is forced to apply, since it was not present at the trial, will normally require it to assume the maximum probative force a reasonable jury might assess and the minimum prejudice to be reasonably expected. Two major factors ... account for this limited review: First, recognition by the appellate court that the cold record cannot fully convey the trial's atmosphere and that the trial judge—attuned to nuances and intangibles to which the reviewing court is deaf—is in a better position to take cognizance of factors crucial to a just result; and second, recognition by the appellate court that it may be so difficult to determine whether a contrary ruling would have led to an appreciably better overall result that in the interests of economy, finality and judicial morale, the trial judge's determination had best be left undisturbed.

*Id.* (citations omitted).

**6.** Some Utah appellate panels have also labeled motions to suppress as mixed questions of law and fact and have applied a two-step approach for reviewing such motions, despite the fact that the Utah Supreme Court has traditionally treated the review of motions to suppress as purely factual issues, reversed only if found clearly

erroneous. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987).

One of the first cases to use this two-step approach was *State v. Arroyo*, 770 P.2d 153, 154–55 (Utah App.1989), *rev'd*, 796 P.2d 684 (Utah 1990). In *Arroyo* the panel determined that a trial court's factual findings underlying its decision to grant or deny a motion to suppress should not be disturbed unless they are clearly erroneous. The panel then stated that in reviewing the trial court's legal conclusions based upon those findings, "we afford no deference and apply a correction of error standard." *Id.* The panel cited *Oates v. Chavez*, 749 P.2d 658, 659 (Utah 1988), for the proposition that conclusions based upon those findings are legal conclusions. However, the *Oates* case is a civil case dealing with a quiet title action, having nothing to do with a motion to suppress evidence.

Subsequent panels have also applied the two-step approach in reviewing motions to suppress. *State v. Hunter*, 831 P.2d 1033, 1035 (Utah App. 1992); *State v. Steward*, 806 P.2d 213, 215 (Utah App.1991). This labelling of motions to suppress as mixed questions of law and fact is overbroad and problematic. Under such an approach, all underlying issues raised in the motion to suppress, such as reasonable suspicion and voluntary consent, traditionally factual issues, could be considered legal conclusions and reviewed under a correction of error standard.

States Supreme Court, Tenth Circuit Court, Utah Supreme Court and Utah Court of Appeals cases, that the clear weight of authority favors holding that voluntariness of consent is a question of fact to be reviewed using a clearly erroneous standard.

*Vigil* offers little rationale as to why voluntariness of consent should be a mixed question of law and fact. The opinion simply uses the "labelling" technique as the means to apply a bifurcated standard of review. First, the opinion uses the labels "subsidiary" findings and "ultimate" conclusions. Those labels are deemed to support the final label that the question of "voluntariness" is a "mixed question of law and fact." Thus, the legal component of the question now labelled as "mixed" justifies the *new* standard of review. Although there is no "rule or principle that will unerringly distinguish a factual finding from a legal conclusion," *Pullman–Standard v. Swint* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982), a factual conclusion does not become a legal conclusion by saying there are subsidiary facts and ultimate facts. Likewise, Rule 52 "does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts." *Id.* at 287, 102 S.Ct. at 1789.

The rationale behind finding that voluntariness of consent is a question of fact is that voluntariness involves an inquiry into a person's state of mind. *United States v. Fouche*, 776 F.2d 1398, 1404 (9th Cir.1985); *Sprouse v. Jager*, 806 P.2d 219, 222 (Utah App.1991). It is a question of the person's actual intent and intent is a "non-technical, fact based inquiry." *Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960). No legal analysis can determine whether a person's consent was voluntary or coerced. A person's state of mind is decided by extrinsic evidence no matter what legal standard might later be applied to that evidence. The Ninth Circuit, sitting en banc, found that state of mind inquiries are essentially factual determinations. *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir. 1984), *cert. denied*, 469 U.S. 824, 105 S.Ct.

101, 83 L.Ed.2d 46 (1984). In so finding, the Ninth Circuit cited the *Pullman–Standard* case in which the trial court had to determine if the facts met the legal standard of "actual motive." *Id.* The appellate court expressly found that the determination of actual motive was not a mixed question of law and fact but a pure question of fact. *Pullman–Standard* 456 U.S. at 289, 102 S.Ct. at 1790. The appellate court applied a "clearly erroneous" standard of review, clearly suggesting that applying a legal standard to findings of fact does not turn a question of fact into a mixed question of law and fact.

The panel in *Vigil* offered four reasons for its finding that voluntariness of consent should be reviewed using the *Ramirez* two-step approach. The panel first looked to the functions of the trial and appellate court. The panel reasoned that the function of the trial court is "the establishment of the predicate facts which emerge after a consideration of all testimony and the weighing of credibility." *Vigil*, 815 P.2d at 1299. The panel reasoned that appellate courts, on the other hand, "take the facts as found by the trial court and square them with the law, sometimes developing the contours of the law in the process." *Id.* It went on to find that this development was better undertaken by the appellate courts. *Id.*

While I agree that the trial court is better situated to establish the facts or that the appellate court is in a better position to develop the contours of the law, I disagree that this development should occur by squaring the facts with the law. It is the law that is being shaped and developed. The law is what is pliable. The law should be squared to the facts, not the other way around. The facts, as delivered by the trial court are rigid unless clearly erroneous. It is not the function of the appellate court to reshape the facts. This is precisely my fear in adopting the *Ramirez* two-step approach. The *Ramirez* approach states that "[i]n reviewing the trial court's decision to admit, which includes the determination of which version of facts to believe, we review for correctness." *State v. Ramirez*, 817

P.2d 774, 782 n. 3 (Utah 1991). It is not the function of the appellate court "to ... substitute for the trial court in the determination of factual issues." *Sabol v. Snyder,* 524 F.2d 1009, 1011 (10th Cir.1975). If the appellate court is allowed not only to review facts for sufficiency of evidence, but also to determine which facts to believe, the trial court becomes a useless vestige.[7]

*Vigil's* second rationale for using the *Ramirez* bifurcated approach to review whether consent is voluntary was based on consistency. The panel found that "[a]ppellate review of legal conclusions and 'ultimate facts' under a correction of error standard promotes the consistent application of legal principles." *Vigil,* 815 P.2d at 1299. Consistency in the application of the law serves the important principle of making the law predictable and a correction of error standard for legal conclusions promotes consistency. I do not agree, however, that courts should review "ultimate facts" or any other kind of fact such as voluntariness of consent under anything but a clearly erroneous standard. The trial court is in the best position to determine facts. This is especially true when determining whether consent is voluntary.

> A trial judge may not be able to articulate exactly what prompted the determination that one consent was voluntary while another was coerced, but the judge knows or senses the difference after hearing first-hand the testimony offered and perceiving the nuances and subtleties of that testimony.

*State v. Carter,* 812 P.2d 460, 468 n. 8 (Utah App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992). The *Duberstein* Court explained why it used a clearly erroneous standard to review questions of intent:

> [T]he nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that the primary weight in

this area must be given to the conclusions of the trier of fact.

*Duberstein,* 363 U.S. at 289, 80 S.Ct. at 1198. The *Vigil* panel, invoking the conventional wisdom that two heads are better than one, stated that three or more appellate court judges without the heavy calendars of a trial court judge and with the time to fully deliberate each issue could better review "ultimate" facts under a correction of error standard. *Vigil,* 815 P.2d at 1299. But the voluntariness of consent is an issue of intent, a factual issue that requires a judge to absorb nuances, subtleties, and combinations of factual elements. All seven appellate court judges, even if they had free calendars and time, cannot necessarily make factual determinations better than one judge who is *present* when the evidence is taken.

*Vigil's* third rationale for using the *Ramirez* two-step approach to review voluntariness of consent is that by deferring to the trial judge's ultimate factual conclusion, there would be no need for underlying detailed conclusions. This is simply not the case. The supreme court of this state dealt with this very issue. In *Rucker v. Dalton,* 598 P.2d 1336 (Utah 1979), the supreme court noted the "importance of complete, accurate and consistent findings of fact." *Id.* at 1338. The *Rucker* court found that findings of fact "should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* The court noted that unless such a process occurred, application of the proper rule of law would be difficult. *Id.* at 1339. It is important to note that in *Rucker,* apparent inconsistencies existed in the trial court's findings of fact, but the *Rucker* court refrained from trying to resolve those inconsistencies. To do so, the court found, would be to make its own findings. The court went on to state that "it is not the function of an appellate court to make findings of fact because it does not have the advantage of seeing and hearing the witnesses testify." *Id.* at 1338 (citing *Mendelson v. Roland,* 66 Utah 487, 243 P.

---

7. *See supra,* note 4.

798 (1926)). Deference to final factual determinations of the trial court under a clearly erroneous standard does not eliminate the need for detailed findings of fact. Detailed findings help the appellate court review both conclusions of law under the correction of error standard and sufficiency of factual findings under the clearly erroneous standard.

Finally, the *Vigil* panel felt it would be analytically deficient to review voluntary consent as a finding of fact under the clearly erroneous standard. The panel's main argument was that there could be "a catalogue of 'findings' that suggests coercion on the part of police officers followed by a factual finding of voluntary consent [that] would be anomalous, leaving the appellate court to somehow weigh or prioritize the inconsistent 'findings.' " *Vigil*, 815 P.2d at 1301. This is exactly what applying a clearly erroneous standard of review to a finding of voluntariness of consent avoids. If the "catalogue of findings" suggests an inconsistency, the appellate court can remand to the trial court for additional findings as was done in *Rucker*. The trial court is the better forum to resolve any inconsistency. The appellate court does not sit "to retry cases submitted on disputed facts. [They] give great deference to the trial court's findings, especially when they are based on live testimony." *Sprouse*, 806 P.2d at 222. More likely, however, if the catalogue of findings is inconsistent, the underlying evidence will not be sufficient to support the inconsistency and the appellate court can properly resolve the inconsistency under the clearly erroneous standard. If voluntariness of consent is labelled a mixed question of law and fact, simply because it is a final factual determination, and the *Ramirez* two-step approach is applied, the appellate court will be able to determine "which version of the facts to believe." *Ramirez*, 817 P.2d at 782 n. 3. For the reasons already stated, this determination is the function of the trial court, not the appellate court.

The only analytically sound way to review whether consent is voluntary is under a clearly erroneous standard. A determination of voluntary consent is made by looking at the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). It is not made by looking at the circumstances individually. The totality test clearly suggests that the whole is greater than the sum of its parts. The trial judge is the only judge in a position see "the whole." The trial judge is present to absorb the subtleties and nuances of the given testimony. The trial judge can best determine the relational aspects of the evidence and make inferences based on his perceptions. The appellate court cannot pick up nuances, subtleties, or relationships from the record. It cannot view the circumstances in their totality.

> It seems entirely reasonable to expect, therefore, that appellate judges will continue to defer to the judgment of trial judges who are 'on the scene' in this area, and that they will not inexorably reach the same conclusion on a cold record at the appellate stage that they might if anyone of them had been sitting as a trial judge.

*Oregon v. Kennedy*, 456 U.S. 667, 677, 102 S.Ct. 2083, 2090 n. 7, 72 L.Ed.2d 416 (1982).

Even if one calls the issue of voluntariness of consent a mixed question of law and fact, this court should adopt the analysis espoused in *McConney*. When classifying mixed questions of law and fact for review purposes, "we adopt a functional analysis that *focuses on the nature of the inquiry required when we apply the relevant rule of law to the facts as established.*" *McConney*, 728 F.2d at 1204 (emphasis added). This court has consistently held that the issues presented in search and seizure cases are highly fact sensitive, *State v. Lovegren*, 798 P.2d 767, 770 (Utah App.1990), and appellate review of these issues, including voluntariness of consent, is a factual inquiry demanding a clearly erroneous standard of review.[8]

---

8. *See also, Love Box Co. v. Commissioner*, 842 F.2d 1213, 1216 (10th Cir.1988) (a clearly erroneous standard is applied if the issue tends to be more factually based and concerns factors more appropriately decided by the trial court).

The result of the application of the *Ramirez* two-step approach to voluntariness of consent determinations is a more expansive "correction of error" standard of review. This result is achieved by simply labelling the issue at hand as a "mixed" question of law and fact. Thus, in *Vigil* the attempt is made to convert the "voluntariness" standard of review from the "clearly erroneous" standard, which defers to the trial judge, to the legalistic correction of error standard.

### 3. Reasonable Suspicion

The main opinion questions the standard of review to be applied to reasonable suspicion. I emphasize that the traditional clearly erroneous standard of review endures as applied to the question of reasonable suspicion.

The Tenth Circuit has consistently determined that the question of reasonable suspicion is a factual question reviewed under the clearly erroneous standard. *United States v. Preciado,* 966 F.2d 596, 597 (10th Cir.1992) (the district court's finding of reasonable suspicion was not clearly erroneous); *United States v. Ward,* 961 F.2d 1526, 1529 n. 3 (10th Cir.1992) (we apply the clearly erroneous standard to the issue of reasonable suspicion); *United States v. Walker,* 941 F.2d 1086, 1090 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (the question of reasonable suspicion should be reviewed under the clearly erroneous standard).

The Utah Supreme Court has also consistently applied the clearly erroneous standard. *State v. Mendoza,* 748 P.2d 181, 183 (Utah 1987) (the reviewing court should not overturn the trial court's determination of reasonable suspicion unless it is clearly erroneous). No supreme court holding subsequent to *Mendoza* modifies this standard.

Furthermore, the Utah Court of Appeals also generally follows the clearly erroneous standard of review. *State v. Leonard,* 825 P.2d 664, 668 (Utah App.1991) (the trial court's determination that the requisite reasonable suspicion existed was not clearly erroneous); *State v. Grovier,* 808 P.2d 133, 137 n. 1 (Utah App.1991) (appellate courts should apply clearly erroneous standard to review determination that reasonable suspicion existed); *State v. Robinson,* 797 P.2d 431, 433 (Utah App.1990) (whether the requisite reasonable suspicion is present to support an investigatory detention presents a question of fact); *State v. Sery,* 758 P.2d 935 (Utah App.1988) (reasonable suspicion is reviewed under a clearly erroneous standard).

Even though the main opinion correctly applies the clearly erroneous standard to the issue of reasonable suspicion because of overwhelming precedent to do so, footnote 2 of the main opinion states that it would "prefer" to follow the bifurcated approach suggested by *State v. Ramirez,* 817 P.2d 774, 781 n. 3 (Utah 1991) and by *State v. Carter,* 812 P.2d 460, 465, n. 6 (Utah App.1991), *cert. denied,* 836 P.2d 1383 (Utah 1992), to the question of whether reasonable suspicion exists.

In *Carter,* an appellate case filed prior to *Ramirez,* the panel acknowledged that prior Utah authority, as well as substantial authority from other state and federal jurisdictions, have treated reasonable suspicion as a factual determination to be reviewed under a clearly erroneous standard. *Id.* at 464 n. 3. However, despite the prevalent authority, the panel stated that it was puzzled by what standard of review to apply in reviewing a trial court's determination of reasonable suspicion. *Id.* at 464 n. 3, 465 n. 6. The panel concluded that "analytically," they were inclined to label the determination of reasonable suspicion as a conclusion of law. *Id.* at 465, n. 6.[9]

9. It should be noted that the ultimate determination of reasonableness under the Fourth Amendment is very different from the determination of reasonable suspicion. The Fourth Amendment protects against *unreasonable* searches and seizures. In determining the reasonableness of a search and seizure, the court employs a dual inquiry: 1) whether an officer's action was justified at its inception; and 2) whether the action was reasonably related in scope to the circumstances that first justified the interference. *United States v. Guzman,* 864 F.2d 1512, 1518 (10th Cir.1988) (quoting *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). Appellate courts should not confuse the issue of reasonable suspicion, a

Using the "rationale" suggested by *Carter* and the footnote in *Ramirez*, the main opinion suggests that Utah courts should apply the two-step approach to reasonable suspicion issues. This use of the two-step approach is misapplied because the *Ramirez* footnote, with respect to search and seizure issues, can be considered dicta, at best. Further, despite the unsupported "rationale" suggested by *Carter* for following the bifurcated approach, Utah case law has consistently determined that reasonable suspicion is to be reviewed under the clearly erroneous standard. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987).

Misapplying the two-step approach to the reasonable suspicion issue would allow appellate courts to conveniently label the finding of reasonable suspicion as a "legal conclusion," rather than a factual issue. This label would then enable appellate courts to review not only the legal conclusions, but also all the factual findings of the trial court de novo, thus, rendering the trial court's role meaningless.

## C. CONCLUSION

The adoption of the proposed *Ramirez* bifurcated standard of review, allowing the appellate court to determine which trial court facts to believe, will seriously erode the power of the trial court and is contrary to precedent and judicial policy. No proffered item of evidence can be admitted unless it satisfies the requirement of relevancy, and determinations of relevancy feature the exercise of and review of discretion. The *Ramirez* approach would abolish the long standing "abuse of discretion" standard for evidentiary rulings. Voluntariness of consent is a highly factual determination made by looking at the totality of the circumstances. The totality of circumstances includes subtleties and relationships not found in a cold record. The trial judge is the only judge in a position to make this determination. The appellate court' should not attempt to make this determination by replacing the highly deferential "clearly erroneous" standard with the new *Ramirez* standard. Appellate courts should not confuse the issue of reasonable suspicion with the Fourth Amendment determination of reasonableness. Reasonable suspicion is a purely factual issue that has consistently been reviewed under the clearly erroneous standard. This court should not rely on footnote dicta in *Ramirez* to eviscerate the trial court's discretionary powers regarding reasonable suspicion determinations.

Under the clearly erroneous standard we must reverse the court's finding on the question before us as clearly erroneous. In order to have reasonable suspicion, the detaining officer must, based on the totality of the circumstances, have a particularized and objective basis for suspecting criminal activity by the particular person detained. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985); *State v. Sery*, 758 P.2d 935, 941 (Utah App.1988). At the time of the stop, the sole objective fact the officer had regarding defendant's behavior was that she had entered a house for three minutes. His only suspicion of defendant in particular was based on a subjective assumption that her conduct "fell into a general pattern" common to drug trafficking. But, at the time of the stop, the officer had no proof that drug trafficking was actually taking place at the house. His bare hunch was not an adequate objective factual basis for a reasonable articulable suspicion that defendant's otherwise innocent act of entering and promptly leaving a house constituted criminal activity. Accordingly, the trial court's finding that the officer had reasonable suspicion was clearly erroneous.

BENCH, Presiding Judge (dissenting):

I respectfully dissent from the majority's reversal of the trial court's finding that the

purely factual issue, with the ultimate determination of reasonableness under the Fourth Amendment, which is reviewed *de novo*. *United States v. Walker*, 941 F.2d 1086, 1090 (10th Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *United States v. Pena*, 920 F.2d 1509, 1513–14 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. McKinnell*, 888 F.2d 669, 672 (10th Cir.1989).

police officer had a reasonable suspicion of criminal activity. My colleagues never explain why the trial court's finding of a reasonable suspicion in this case is clearly erroneous. Instead, they summarily conclude that the facts do not support a reasonable suspicion that defendant was engaged in criminal activity.

One of the guiding legal principles that the trial court must follow in finding a reasonable suspicion is the requirement that it consider the totality of the circumstances facing the officer. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987). Utah courts have traditionally held that a trial court has broad discretion in making its findings when utilizing a totality of the circumstances approach. *State v. Steward*, 806 P.2d 213, 215 (Utah App.1991); *cf. State v. Hansen*, 732 P.2d 127, 128–29 (Utah 1987) (giving great deference to magistrate's finding of probable cause based upon totality of circumstances); *State v. Stromberg*, 783 P.2d 54, 57 (Utah App. 1989) (same). Absent some articulated reasoning as to why the facts relied upon by the trial court do not support a finding of reasonable suspicion *as a matter of law*, the majority is simply substituting its judgment for that of the trial court. If the clearly erroneous standard were truly applied in this case, the trial court's finding would be affirmed.

Defendant asserts that the police officer unreasonably seized her when he stopped her car. In essence, her argument is that her conduct was not suspicious enough to justify the stop. In order to stop Sykes, the officer needed only an "articulable suspicion" that she was involved in criminal activity. *See State v. Deitman*, 739 P.2d 616, 617–18 (Utah 1987) (per curiam) (quoting *United States v. Merritt*, 736 F.2d 223, 238 (5th Cir.1984)). While the officer in this case likely did not have probable cause to arrest Sykes for purchasing drugs before he stopped her, he clearly had articulable suspicions of criminal activity that warranted further investigation.[1] *See State v. Menke*, 787 P.2d 537, 541 (Utah App.1990) (ability of officer to articulate facts indicates he operated on "articulable suspicion" and not a mere "hunch"). It is readily apparent that the officer in this case was not acting on a mere hunch.

The officer explained that he observed Sykes participating in what objectively appeared to be a drug purchase at a house where drug dealing was suspected. The house was under surveillance because neighbors had reported frequent brief visits to the house, which activity is indicative of drug trafficking. A confidential informant had also provided to the police information regarding the drug activities at the house.[2] The officer had personally observed the frequent and short visits of others to the house. He was also personally aware that drugs were available in the area because he had previously made an undercover purchase in the same neighborhood. In the officer's experience,[3] Sykes's actions of entering the home briefly and then leaving were indicative of a drug purchase. *See United States v. Griffin*, 909 F.2d 1222, 1223 (8th Cir.1990) (officers had reasonable suspicion to stop a vehicle as it left a suspected drug house); *United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir. 1989) (a brief visit to a suspected drug house "conformed to the patterns of the

1. The officer could stop Sykes with less than probable cause to arrest her.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

2. Anonymous or confidential tips may be sufficient to establish a reasonable suspicion warranting further investigation. *See generally State v. Velasquez*, 672 P.2d 1254, 1262 (Utah 1983).

3. The officer had been a deputy sheriff for over nine years and a member of the narcotics division since 1987. He had received narcotics training from the United States Drug Enforcement Agency, the Federal Bureau of Investigation, the Los Angeles Police Department narcotics division, and the Utah Division of Police Officer Standards and Training.

drug trade"); *State v. Biegel,* 57 Wash. App. 192, 787 P.2d 577, 578 *rev. denied,* 115 Wash.2d 1004, 795 P.2d 1156 (1990) (police had reasonable suspicion even though they did not know what occurred inside when defendant made a short visit to a suspected drug house).

When all of these objective, articulable facts, along with their reasonable inferences, are combined, the trial court could rationally find that the officer had an articulable suspicion that Sykes stopped at the house in order to purchase drugs. The majority, however, says this finding is clearly erroneous. It does so without ever explaining why it was unreasonable for the police officer to stop Sykes to inquire about suspected criminal activities at the house. In short, the majority does not set forth any applicable law that precludes the trial court's finding which appears to have a solid basis in fact and law.

In *State v. Holmes,* 774 P.2d 506, 509 (Utah App.1989), we affirmed a finding of reasonable suspicion based upon similar circumstances regarding an individual's suspicious activity in an area where crime was suspected. We held that the defendant's presence in a "high crime area" alone was insufficient to constitute reasonable suspicion. We nevertheless upheld the trial court's finding of reasonable suspicion because the officers observed the defendant conducting "a particular type of activity which was ... consistent with criminal activity...." Sykes's own conduct linked her with the suspected illegal activities at a house under contemporaneous surveillance for drug dealing. The short, frequent visits by others to the house, personally witnessed by the officer, constituted an outward indication that this probably was a drug house and provided the officer with an objective confirmation of the complaints made by the neighbors. Sykes was therefore not just in an area where the officer knew drugs were available; she entered the very house where drug dealing was suspected, and acted in a particular manner indicating the very criminal conduct under active investigation.

When the totality of the circumstances in the present case is considered, the officer certainly had an articulable reason to suspect that Sykes was involved in criminal activity based on her own actions. Her particular conduct was consistent with a drug purchase at a house under surveillance for drug dealing. The trial court's finding therefore appears on its face to be perfectly acceptable.

The thrust of the majority's holding is simply that there might have been an innocent explanation for Sykes's conduct. The majority speculates that Sykes might have stopped to visit somebody who was not at the house and therefore left quickly. This speculation is legally insufficient to upset the trial court's finding because it does not preclude a finding of reasonable suspicion. The Supreme Court has acknowledged that experienced officers may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown v. Texas,* 443 U.S. 47, 52, n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979). It is well-settled in Utah that a reasonable suspicion may be found even though the defendant's conduct was consistent with innocent activity. *State v. Davis,* 821 P.2d 9, 12 (Utah App. 1991) ("although there may be a host of other innocent explanations," the officer had a reasonable suspicion); *Menke,* 787 P.2d at 541 (defendant's actions which were consistent with innocent activity were also indicative of shoplifting). A trial court may even make the more demanding finding of probable cause despite the existence of innocent explanations for the conduct. *State v. Weaver,* 817 P.2d 830, 834 (Utah App.1991) (innocent explanations do not preclude finding of probable cause); *Holmes,* 774 P.2d at 509 ("the law does not require that 'all innocent explanations for a person's actions be absent before those actions can provide probable cause for an arrest'") (quoting *Wood v. United States,* 498 A.2d 1140 (D.C.1985)). These cases clearly establish that a trial court is not precluded, as a matter of law, from finding reasonable suspicion based upon suspicious activity that might otherwise have an innocent explanation.

Under the clearly erroneous standard, the majority must show how the trial court was precluded from finding a reasonable suspicion by reviewing the facts relied upon by the officer and explaining why, as a matter of law, it was improper to consider them. *See, e.g., Mendoza,* 748 P.2d at 183–84. Since the majority has failed to foreclose the possibility of a finding that the officer had a reasonable articulable suspicion as a matter of law, it errs in substituting its judgment for that of the trial court. In essence, my colleagues would require that the officer have subjective proof of drug dealing at the house before they would find the officer's suspicion to be objectively reasonable. Not only does such reasoning ignore the trial court's proper role, it ignores the well-established rule that "[t]he process does not deal with hard certainties, but with probabilities." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Inasmuch as the trial court did not violate any legal principle in finding that the officer had a reasonable articulable suspicion, I would defer to the trial court's finding. I therefore respectfully dissent.